**E-FILED**
Friday, 22 April, 2005  04:43:23 PM
Clerk, U.S. District Court, ILCD

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No: 02-30063 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| CHRISTINE ROBERTS, | ) | |
| | ) | |
| Defendant. | ) | |

### GOVERNMENT'S COMMENTARY ON SENTENCING
### FACTORS AND MEMORANDUM

Comes now the United States of America, by Jan Paul Miller, United States Attorney for the Central District of Illinois, and Patrick D. Hansen, Assistant United States Attorney, and respectfully submits its commentary memorandum regarding sentencing factors for defendant, Christine Roberts.

**I.    Issues to Be Resolved**

This matter, currently set for sentencing on April 27, 2005, presents several issues this Court must determine in calculating the appropriate sentencing guideline range.  Understanding that the sentencing guidelines are advisory only, *United States v. Booker*, 125 S.Ct. 738 (Jan. 12, 2005), they are still an important factor in fashioning an appropriate and reasonable sentence.

Based upon the objections to the pre-sentence report, and the findings made in the revised pre-sentence report, the government submits that the following issues need to be resolved by the Court at the time of sentencing:

a.    Paragraphs 50 and 67: Whether the Defendant has clearly demonstrated a recognition and affirmative acceptance of responsibility for her criminal conduct;

b.    Paragraphs 20-23: Whether the $94,695.74 loss to U.S. West should be counted as "relevant conduct;"

c.    Paragraphs 44, 55, 61, 70 and 108: Amount of Loss to Moorman's, Inc.; and

d.    Paragraphs 48, 49, 58 and 64: Enhancement for Obstruction of Justice.

The government intends to present no new evidence or witnesses at the sentencing hearing in support of its positions on these issues, but will stand on the evidence introduced during the trial and plea hearings, and that outlined herein.  In resolving the specific objections and issues raised by the parties, it is necessary to review the facts as presented at trial, which were incorporated in the plea in this case.

## II.    Evidence Presented at Trial

### A.    Fraud Against Moorman's, Inc.

In January, 1995, Roberts applied for a position as Director of the Information Services (IS) Department at Moorman's Manufacturing, Inc.  Moorman's had hired an executive search firm, DHR, to locate an acceptable IT Director.  At the time it hired DHR, Moorman's specified prerequisites for its new executive, including minimum education requirements.  Roberts did not satisfy those educational requirements, but according to John Rust, she misrepresented her educational background to DHR, suggesting that she had a college degree and had worked towards a Master's Degree, neither of which were true.  DHR, in turn, misrepresented her educational background to Moorman's.

2

Partly as a result of those misrepresentations, Roberts was hired and began working as the Director of Information Services (IS) for Moorman's on March 20, 1995.[1]   As Director of IS, Roberts was granted great latitude in steering various major computer projects toward completion.  In this role, Roberts was integral in the process of selecting and hiring outside vendors to assist on the projects.  In addition, Roberts possessed sole authority to approve invoices for work in her department up to $50,000.00.  When additional approval was required, her supervisor(s), who did not have her technical savvy or expertise in "I-S" related matters, relied on her representations of the work performed by the vendors and the significance of that work toward the completion of the projects.

1. **Roberts approved payment of $16,000 from Moorman's to her live-in boyfriend's business, Get-a-Grip.**

The evidence showed that Roberts used her position at Moorman's to submit and approve false invoices from at least two companies which did no real work for Moorman's.  The first company was that belonging to Mark Gipson, who in March of 1997 was her live-in companion. The evidence showed that Roberts created and submitted to Moorman's, and personally approved for payment two $8,000 invoices in the name of "Get a Grip," suggesting that "Get-a-Grip" performed a necessary service for Moorman's,  despite there being no credible evidence that "Get a Grip" or any person associated with such company, ever performed work for Moorman's.[2]

---

[1] As noted in the "U.S. West" section , this is the same date she was granted a "personal leave of absence" from U.S. West due to claimed severe emotional problems.

[2] The defendant's former live-in companion, Mark Gipson, testified at trial that he performed some work which would support the invoices.  This testimony was inconsistent with that given by Gipson before a Federal Grand Jury in April of 2000, wherein he could not even define the some of the terms written on the invoices.

3

The evidence showed that sometime in 1995, Roberts rented a post office box in Keokuk, Iowa, under the name of "Tina Yearick."  As will be further explained in section "E" of this memo, this box allowed her to surreptitiously continue her previous employment relationship with U.S. West.  Nevertheless, even after the relationship with U.S. West ended, Roberts renewed that post office box, specifically "P.O. Box 691, Keokuk, Iowa," still using the name "Christine Yearick" on or about March 10, 1997.  Despite living in Quincy, Illinois at the time, Roberts listed a home address of "23918 Matterhorn Dr., P.O. Box 25, Indian Hills, Colorado 80454," on the 1997 renewal.

On or about March 28, 1997, eighteen days following her renewal of the post office box, Roberts submitted an invoice (Government's Exhibit 1A-1) to Moorman's in the amount of $8,000 for work purportedly performed by the company "Get-A-Grip."  This invoice listed the business address for the company as P.O. Box 691, Keokuk, Iowa.  Gipson testified that he never saw the invoices submitted to Moorman's and never used the Keokuk post office box for his business.  Indeed, despite his testimony at trial that he performed some vague service for Moorman's, Gipson testified twice before the grand jury that he had only a passing knowledge of this post office box and never listed the box as his business address.  After Roberts approved the invoice for payment, Moorman's approved a check for $8,000 that was, in fact, addressed to and sent to the post office box. (G. Ex. 1C-1)  Roberts personally endorsed the check, writing "Get a Grip, Mark Gipson," and negotiated it through a joint checking account.(G. Ex.1E-2) Gipson testified that he never saw this check.

Roberts then submitted a second invoice to Moorman's in the name of "Get a Grip," also in the amount of $8,000 and dated June 1, 1997. (G. Ex.1A-2) Roberts approved payment of that

4

invoice on behalf of Moorman's on or about June 18, 1997. Based on this approval, another

Moorman's check was issued for $8,000 and addressed to the Keokuk post office box, but that

check never cleared the bank. Subsequently, a replacement check was issued on or about

November 25, 1997. (G. Ex.1C-2) Rather than sending this check to the Keokuk post office box,

though, Roberts had the check returned to her at the Quincy office. By this time, however,

Gibson had moved out of Roberts' house in Quincy and back to the Denver area. Roberts mailed

the check to Gibson, who deposited it into his bank account, (G. Ex.1E-8) and immediately

thereafter wrote a personal check to Roberts for $8,000, which he mailed back to Roberts. (G.

Ex.1E-9) The $8,000 check from Gipson was deposited into Roberts' bank account.(G. Ex.1E-

10)

      **B.     Roberts approved payment of $781,632.00 from Moorman's to her sister's company, Morgan & Associates, Inc.**

Following the initial "Get-A-Grip" payment, the evidence showed that Defendant

Christine Roberts recruited her sister, Valerie Morgan, to assist in the continuing effort to

defraud Moorman's. On July 7, 1997 -- only 24 days after Roberts collected the proceeds from

the first part of the Get A Grip scam -- Morgan telephoned Roberts' accountant, Kathy Clemons,

and inquired about setting up a business. Clemons testified that Morgan told her that Roberts

had referred Morgan to Clemons. She further testified that Morgan, at the time she met with

Clemons, indicated that she needed to incorporate a "start-up" business. Clemons encouraged

Morgan to make the business a "subchapter S" corporation to avoid double taxation and expense.

Morgan adamantly stressed, however, that it was more important to keep the business separate

from her personal life than to utilize the most tax efficient organizational structure. At no time

during this or subsequent conversations did Morgan mention that she was owed any payment for

work performed during 1996 and the first half of 1997, as Defendant Roberts tried to portray at trial.

Morgan incorporated the business, which she named "Morgan and Associates, Inc." on or about July 22, 1997. (G. Ex.110A) On July 30, 1997, Morgan rented a personal mail box, number 158, at "The Mail Box" in Boulder, Colorado under the name of "Morgan and Associates." (G. Ex.111A) Morgan and Roberts then used this address, 288 Bluff St., Suite 158, Boulder, Colorado, to submit invoices to Moorman's. The address suggested that the mailbox was an office suite.

The first Morgan & Associates' invoice was submitted August 11, 1997.[3] (G. Ex.2A-1) Two days later, Roberts began spending the money she anticipated from the scam. She paid $500 to reserve two spots, one for her and one for her new boyfriend, on a $12,000 trip to South Africa that was ultimately paid for by Morgan (and, as explained by Clemons, disguised on Morgan's records as a payment to some other individual). Roberts approved the first Morgan and Associates' invoice for payment on August 21, 1997. (G. Ex.2B-1) That very day, Morgan opened a checking account in Colorado in the name of Morgan & Associates. (G. Ex.13A-1)

The next Morgan & Associates' invoice, for $92,400, was dated August 18, 1997. (G. Ex.2A-2) Moorman's sent Morgan a check for $208,000 on or about September 8, 1997, which was received by Morgan on September 15. That day, Morgan deposited the check into a Morgan & Associates' account, transferred $75,000 to her personal bank account, and immediately wired

---

[3]  Morgan provided documents after the payments were questioned by ADM security in May and June of 1998 to make this invoice appear as a "reinvoice of 12/11/96." The original August 11, 1997 invoice made no mention of this prior work, and neither Moorman's, nor either sister were able to produce any evidence of an earlier invoice.

$45,000 from that account back to Roberts' account in Illinois. The two sisters spent the following weekend, September 19 and 20, shopping together at the Mall of America in Minneapolis, Minnesota. On September 23, 1997, Roberts purchased a $30,000 cashier's check payable to Gipson.

Records and testimony showed that over the course of approximately 8½ months, the defendants submitted invoices to Moorman's totaling $781,632.00. (See G. Exs. 2A-1, 2A-2, 2A-3, 2A-4, 3A, 4A, 5A, 6A, 7A, 8A, 9A, 10A-1,10A-2, 10A-3)

### C.     The Evidence Showed That There Was No Work Performed For the Money

Numerous individuals involved in the project, including Roberts' secretary, Vicki Glas, I.S. department personnel Duane DeWald, Tony Welsh, Andrew Doellman and Diane Ary, as well as the I.B.A. representative Todd Colas and Roa Nalla from Denver Software, testified that they never heard of Morgan & Associates or knew that Roberts' sister was working on the project. There was also no evidence presented that Morgan was in any way involved with, or "consulting" with Roberts regarding the project. Indeed, Roberts developed a personal relationship with some of the members of the project team. They testified that they knew that Roberts had a sister, and that Roberts' sister ran a small company that taught kids to use computers. Roberts did not tell any of them that her sister was involved in the project or had invoiced $781,632.00 for "work" on the project.[4]

---

[4]     In addition to the "Get-A-Grip" invoices and "Morgan and Associates" invoices, the evidence showed that Roberts prepared  phony invoices for other companies as well, including an invoice for Sysix, Inc., on a project to modify the server system at Moorman's. The actual proposal from Sysix, however, was not even created until after the date of the invoice. Nevertheless, a check in that amount was approved by Roberts and sent to Sysix in March, 1998. ADM investigators also discovered two false invoices from Irving Burton and Associates (IBA), a company on whose board of directors Roberts sat until at least January, 1998. An audit by ADM, however, confirmed that

Moreover, at some point, Roberts' superior at Moorman's, Dennis Sollberger, questioned her about the invoices submitted by Morgan & Associates. Sollberger testified that Roberts characterized Morgan & Associates as a legitimate business that was made up of 6-8 computer programmers, had been in business for around 5 years, and serviced multiple core companies similar to Moorman's. None of this was true, but was necessary to continue the fraud, as Sollberger stated that he would have ended the payments had he even been aware that Morgan was related to Roberts. He testified that he would not have approved payments of such a large amount in such a short period of time had he not been led to believe by Roberts that the Morgan programming "expertise" was needed to complete the IS projects.

Some of the people identified as "employees" for Morgan & Associates also testified, including Virginia Rainey and Tommie Hill. Rainey, the highest paid employee[5], emphatically stated that she performed no work for Moorman's and that she only made it appear that she had performed work after Morgan asked for her help. She testified that the vast majority of the money given to her was returned to Morgan in the form or cash, or checks written per Morgan's directions. Hill not only testified that he did no work for Moorman's, he testified that he had

work encompassing the amounts billed in the phony invoices was performed, or items costing a similar amount were provided by the companies, but were not for the items suggested by the phony invoices.

[5]It is interesting to note that the exhibits produced at trial showed that Morgan created a 1099 form for Rainey suggesting payments totaling $42,000 in 1997 (G. Ex. 19C-2) and $67,725 in 1998 (G. Ex. 19C-3). Morgan then filed an income tax return for 1997 which claimed that she was paid nothing from the company. This return was amended after the start of the investigation, and Morgan still only claimed $30,866 in miscellaneous income from Morgan and Associates in 1997 (G. Ex. 113 C) while claiming wages of $32,000 in 1998.

never even heard of the company until after the United States began its investigation. Neither were computer programmers, and neither had any experience or expertise in the I.T. field.

This conclusion is also buttressed by the testimony of Morgan's accountant, Kathy Clemons. Clemons testified that Morgan approached her in September of 1997 and told her that the company, Morgan and Associates, had received an "advance" on a contract for about $200,000.[6] Morgan then asked the accountant about the tax consequences that would result if she made a lump sum payment to Charles Morgan, her husband, for $170,000 for an "algorithm" he had supposedly written for Moorman's on behalf of "Morgan and Associates." Despite the prior representations to her accountant, Morgan and Roberts later created, and Morgan submitted records and testimony to the Grand Jury that suggested the initial check was payment for work Morgan performed during 1996 and 1997.

Finally, many of the records submitted by Morgan to the Grand Jury in response to a subpoena calling for the Morgan and Associates work product was demonstrably false. Witnesses Lawrence Gould, David Lenckus and Maryann McGee each identified articles that they had written for various publications which had been submitted by Morgan to the Grand Jury as part of her "work product." (See Exs. 17E-1 through 17E-6). None of these articles were even published prior to Roberts being terminated by ADM, and, therefore, could not have been a part of any "work product" Morgan delivered to Moorman's.

Additionally, Greg Quirk testified that he was the author of the "Data Warehouse" document which defendant Roberts claimed was a draft, and on which she had written a note

---

[6]Moorman's had recently paid several Morgan and Associates invoices and sent a check to Morgan totaling $208,000.

9

suggesting that the document be reviewed by Morgan. (G. Exs. 17F-1 to 17F-6) Quirk

demonstrated at trial that the "draft" was in fact a copy of the original final deliverable, which

was modified after delivery to remove the "Oracle" logo and identifying characteristics.  The

demonstration showed that the document was not "work product," or forwarded to Morgan as a

draft on an earlier date, as it pretended to be.

Had legitimate, valuable work been done on this project by "Morgan and Associates," as

now claimed, some person beyond Morgan and Roberts would know about it, and some

legitimate evidence would be left behind to show this work.   There would be no need for

forgeries, or altered documents, or false statements to accountants and investigators.  There also

would have been no need for Morgan to solicit her friend, Virginia Rainey, to commit crimes by

providing false information to investigators and the Grand Jury.

**D.      Roberts and Morgan concealed the Income to Morgan & Associates and the
          Money returned to Roberts**

Additionally, in support of the fiction that this was a legitimate business, Roberts and

Morgan produced records, receipts, vouchers, calendars and notations on checks to falsely make

it appear that "Morgan and Associates" was providing a legitimate and valuable service to

Moorman's.  These records were to show that much of the money Morgan and Associates

received was being paid or transferred to sources other than Roberts and Morgan.  A closer look,

however, instead revealed that during this period, Morgan and Roberts used various techniques to

kick back approximately half of this money to defendant Roberts.

**1.      Payments to Credit Cards**

•       The evidence shows that Morgan paid tens of thousands of dollars toward

        Christine Roberts' and Mark Gibson's credit cards during the time Gipson lived

10

with Roberts.  For example, on May 1,1997, Morgan issued a check to Gipson's Fleet Credit card for $8,000 (G.Ex. 11D-7) and on May 15, 1997, another $8,000 to the same account, as the first check bounced (G.Ex. 11D-7A).

- On or about May 1, 1997, Morgan issued a check in the amount of $2,000 to Mark Gipson's First Card account (G. Ex. 11D-9).

- On or about May 1, 1997, Morgan issued a check in the amount of $6,000 to Mark Gipson's Chase credit card (G. Ex. 11D-10).

- On or about May 1, 1997, Morgan issued a check in the amount of $7,376.26 to Christine Roberts American Express account (G. Ex.11D-8).

- In or about March 1998, Morgan split-deposited a $110,355 check from Moorman's, with $15,000 going to her personal account and the remainder going to a corporate account. (G. Ex. 11N-1).  In or about April 1998, Morgan wrote six checks totaling $25,000 payable to six different credit card companies to pay credit card bills of Roberts (G. Exs. 11Q-1 through 11Q-12).

**2.    Payments to or in the name of Third Parties**

- On or October 4, 1997, Morgan wrote a personal check (check #4014) for $12,000.00 (G. Ex. 11D-12).  She falsely wrote that the purpose of the check was to pay for "horses-Rainey" and used the check instead to purchase a cashier's check payable to "Christine Roberts," on which she falsely showed the remittor to be Virginia Rainey.

- In or about November of 1997, Morgan used $16,000 from money traceable to Moorman's, and used it to purchase a truck with a former paramour named

11

Tommie Hill (G. Exs. 11B-11 to 11B-13).   In March of 1998, the title to this truck was used to secure a loan (in the name of Tommie Hill) from MegaBank in Denver, Colorado (G.Exs. 11B-14 and 11B-14A).  Roberts received a cashier's check in the amount of $16,000 from MegaBank and this was deposited into her bank account (G. Exs. 11B-15, 11B-16 and 11B-17).

**3.**     **Payments laundered through personal bank accounts to Christine Roberts**

•      On or about September 15, 1997, Valerie Morgan deposited a check for $208,000 from Moorman's (G. Ex. 2C), transferred $75,000 to her personal checking account (G. Ex. 13B, 13C and 13D), and immediately wire transferred $45,000 from that account to Christine Roberts' checking account in Quincy, Illinois. (G. Exs. 12, 13C and 13D).

•      From the money transferred to her personal account, on or about October 3, 1997, Morgan wrote a check on her personal account (check #3100) to purchase a cashier's check for $18,600 for "Christine Roberts" (G. Exs. 11B-1, 11D-16).  In or about October 1997, the $18,600 cashier's check, the $12,000 "horses Rainey" cashier's check, along with a personal check from Morgan in the amount of $4,400 were deposited to Roberts' bank account in Colorado.

•      On or about December 8, 1997, Morgan wire transferred an additional $5,000 from her personal checking account to Roberts' account (G. Ex. 14A-1).

•      On or about February 1, 1998, Morgan wrote a check on her personal account for $17,000 payable to "Christine Roberts," (G. Ex. 11J-2) which was deposited into Roberts' bank account (G. Ex. 11J-3).

- On or about March 31, 1998, Morgan wrote a check for $44,845.69 payable to Mark Stuhmer, who was then living with Roberts (G. Ex. 11T-2).   Morgan falsely declared that the payment was for "consultive services." In or about April 1998, Stuhmer endorsed the $44,845.69 check and caused it to be deposited to Roberts' checking account (G. Ex. 11T-3).

**4.    Payments for Vacations and Expenses of Christine Roberts**

- On or about December 26, 1997, Morgan wrote a check for $5,499 drawn on her corporate account payable to Roberts for a trip to South Africa (G. Ex. 11H-6). In March of 1998, Morgan had a conversation with Kathy Clemons, her accountant, during which she told Clemons that this was part of a $7,000 loan to herself through which she paid for an employee, Tom Miller Stewart, to go to South Africa.  This was then listed as a business expense for tax purposes.

- On or about March 10, 1998, Morgan purchased a cashier's check in the amount of $21,500 payable to "Christine Roberts." (G.Ex   In or about March 1998, Roberts endorsed the cashier's check and used it to pay her MBNA credit card bill.

As previously noted, Rainey also testified that she did no work on behalf of Moorman's despite being listed as an "employee" or contractor of Morgan and Associates.  She was asked by Morgan, however, to deposit several checks into her account and sign certain documents to make it appear that she was an employee or contractor for Morgan and Associates, to lie to the Grand Jury and investigators, and to falsify calendars and other records to submit to investigators.  Most of the money given to Rainey by Morgan was returned to Morgan through various financial

13

transactions.  At best, according to Rainey, she assisted Morgan in a small venture around the

Boulder, Colorado area, to teach pre-school children the use of computers.  This venture, named

"KidsQuest," never generated much income, was eventually used to disguise the source and

nature of $27,000 that Morgan laundered through Rainey, and eventually failed.

## II.     Loss Amount to Moorman's

The amount of loss is the actual or intended loss that was reasonably foreseeable resulting

from the offense.   Based on the evidence produced at the trial, the Government submits that

Christine Roberts is responsible for $797,632.00 from the Moorman's conduct under Guideline

Section 2B1.1(a). This calculation is based on the total amount of invoices, outlined below,

billed from "Get A Grip" and Morgan and Associates, which is also the amount of checks written

to these entities.

### Get A Grip

| Exhibit # | Invoice number | Date | Amount |
|---|---|---|---|
| 1A-1 | (None) | March 28, 1997 | $8,000.00 |
| 1A-2 | (None) | 6/1/97 | $8,000.00 |
| Total Billings: | | | $16,000.00 |

### Morgan and Associates

| Exhibit # | Invoice number | Date | Amount |
|---|---|---|---|
| 2A-1 | 7801 | 8/11/1997 | $ 57,800 |
| 2A-2 | 8211 | 8/18/1997 | $ 92,400 |
| 2A-3 | 8675 | 10/31/1997 | $ 57,800 |
| 2A-4 | 8699 | 11/3/1997 | $57,800 and $57,800 credit |
| 3A | 8302 | 10/18/1997 | $ 23,000 |

14

| | | | |
|---|---|---|---|
| 4A | 8502 | 12/10/1997 | $ 17,000 |
| 5A | 8612 | 12/23/1997 | $ 22,000 |
| 6A | 8706 | 1/29/1998 | $ 37,000 |
| 7A | 8798 | 2/6/1998 | $110,355 |
| 8A | 8908 | 2/16/1998 | $122,930 |
| 9A | 9118 | 3/18/1998 | $ 62,507 |
| 10A-1 | 9201 | 3/22/1998 | $ 52,550 |
| 10A-2 | 9243 | 4/6/1998 | $ 57,120 |
| 10A-3 | 9301 | 4/29/1998 | $ 69,170 |

Total Billings:                                                    $781,632

Amount of Restitution:  The amount of restitution should reflect that the victim became aware of some scheme in June of 1998, fired Christine Roberts and stopped payment on the final two checks written to Morgan.  In the meantime, when the scheme was discovered, Morgan attempted to cover the fraud by making return of something she termed "contract reserve" (a meaningless term according to the victim).  The return check was refused for insufficient funds, as it was partially purchased with the checks ADM withdrew.  A remaining amount, specifically $86,960, was left at the Norwest Bank from this series of transactions, and recovered by ADM in 2004.

The checks written by Moorman's  and ADM in response to the invoices submitted, all of which were approved by Roberts, are listed as follows:

### Get A Grip

| Exhibit Number | Date | Amount |
|---|---|---|
| 1C-1 | May 16, 1997 | $8,000.00 |
| 1C-2 | November 25, 1997 | $8,000.00 |
| Total: | | $16,000.00 |

15

**Morgan and Associates**

| Exhibit Number | Date | Amount |
|---|---|---|
| 2C | September 10, 1997 | $208,000.00 |
| 3C | November 18, 1997 | $ 23,000.00 |
| 4C | January 9, 1998 | $ 17,000.00 |
| 5C | January 22, 1998 | $ 22,000.00 |
| 6C | February 27, 1998 | $ 37,000.00 |
| 7C | March 6, 1998 | $110,355.00 |
| 8C | March 18, 1998 | $122,930.00 |
| 9C | April 9, 1998 | $ 62,507.00 |
| 10C | May 11, 1998 | $178,840.00 |
| | | |
| Total: | | $781,632 |

RECAP:

| | | |
|---|---|---|
| Moorman's (Get a Grip): | $ | 16,000.00 |
| Moorman's (Morgan & Associates.): | | 781,632.00 |
| Total Intended Loss | | $797,632.00 |

## III.     The "U.S. West Acts" are Fairly Counted as Relevant Conduct

The United States Sentencing Guidelines contemplate that the offense level be

determined on the basis of  all acts and omissions that were a part of the same course of conduct

or common scheme or plan as the offense of conviction.  U.S.S.G. §1B1.3.  In this case, the

evidence was clear that the U.S. West acts were part of such a common scheme, and were

intertwined in time and location with much of the Moorman's fraud.

### A.     Roberts maintained dual employment between March 20, 1995 and August 16, 1996.

In addition to defrauding Moorman's directly through this false-invoicing scheme,

Roberts also defrauded Moorman's by  maintaining dual employment relationships with

Moorman's and U.S. West.

16

**1.    Roberts was employed at U.S. West from 1970 until August 16, 1996.**

Roberts began working for U.S. West in 1970.  After frequent absences beginning in January, 1995, Roberts took short-term disability leave in early March, 1995, for a reportedly minor surgery.  On March 20, 1995, she returned to the U.S. West payroll, but never returned to the office as she began as an executive for Moorman's at this same time.  She used sick and personal vacation time to continue to receive her full salary from U.S. West until June 3, 1995.

Roberts did not tell U.S. West that she was offered and accepted the position of "Director of I.S." at Moorman's in Quincy, Illinois.  Nor did she inform Moorman's that she maintained her status as an employee of U.S. West in Denver.

In June, 1995, Roberts was granted a "personal leave of absence" from U.S. West.  U.S. West had a policy that each "personal" leave of absence had to be reviewed every ninety days.  Accordingly, Roberts kept in periodic contact with her supervisor, Audrey Hargrove, and some employees of the Health Services division of U.S. West.  During conversations with Hargrove and the employees of the Health Services division, Roberts stated that she was unable to work due to the stresses of daily life, aggravated by the perceived lack of respect shown to her by U.S. West. She claimed that she was suffering from severe psychological problems, often could not get out of bed, and was completely unable to work.  In actuality, Roberts was working full-time as an executive for Moorman's and living in a home in Quincy, Illinois.

During this time, Roberts listed her home mailing address with U.S. West as P.O. Box 691, Keokuk, Iowa, 52632.  Roberts told Hargrove that she moved from Colorado due to the stress created by her work at U.S. West.  She explained that she selected Keokuk because she was living with her brother and trying to "get herself together."  Roberts also reported to U.S.

West that she would lay around her brother's house for days at times, and often could not leave her bedroom.

She reported to work for Moorman's and adequately performed the function for which she was hired.  Despite this, she reported to U.S. West that she was unable to perform even daily personal activities.

> **2.    Roberts maintained her Employment Relationship with U.S. West through a Series of Misrepresentations**

As previously noted, Roberts represented to U.S. West personnel that she was unable to work due to severe psychological harm caused by her time at U.S. West.  According to the records and testimony submitted by Linda Caruso, she asked that all communication be sent to her in Keokuk, Iowa, where she claimed to be living with her brother. (G.Ex. 78A, 78B and 79) Keokuk is approximately 30 miles from Quincy, where Roberts was actually living.

Due to her reported psychological problems,  Roberts was referred to the Health Services department of U.S. West in the fall of 1995. (G. Ex. 79)  Roberts continued to report symptoms of severe depression that made it impossible for her to work anywhere, including U.S. West.  At the suggestion of employees with the Health Services department, Roberts began "seeing" a counselor at the River Center for Community Mental Health, in Keokuk, Iowa, with whom she continued the charade under the name of Tina Yearick.  (G. Exs. 79G-1 through 79G-5)  Due to these representations and machinations, Roberts was classified by U.S. West as "disabled" on February 14, 1996, almost one full year after accepting the position as the I.S. director for Moorman's. (G. Ex. 79)  U.S. West paid Roberts disability payments, company bonuses, and a management buyout following this reclassification. (G. Ex. 78B)

To continue the disability payments and benefits, U.S. West required Roberts to undergo an examination.  On April 11, 1996, Roberts (again, using the name Yearick) reported to the University of Colorado Health Services Center for psychological interviews with Dr. Doris Gunderson and Occupational Therapist Mark Austin.  As both these professionals testified, Roberts, as Tina Yearick, never reported to the medical officials that she was then the I.S. Director at Moorman's, but instead reported "feeling tired consistently despite sleeping long hours during the day."  (G. Exs. 79I and 79J) According to Dr. Gunderson's report, Roberts also reported "some short term memory difficulties."  The document continues that "She reports getting confused and disoriented at times."  She describes driving on familiar routes near her home and getting lost.  She also describes feeling paranoid.  She states 'I'm afraid people are going to yell at me.'" (G. Ex. 79I)

Roberts continued her deception of U.S. West through August, 1996, when, because of her status as a "management level" employee (albeit on disability), she became eligible for a management "buy-out" from her position at U.S. West.  According to her U.S. West supervisor, Audrey Hargrove, this opportunity would not have been available if Roberts had left the company at the time she began her employment with Moorman's, nor would U.S. West have paid Roberts thousands of dollars in disability benefits during that time.  In total, Roberts was paid $94,695.74 from U.S. West as a result of her false claims of disability. (G. Ex. 78C)[7]

---

[7] Government's Exhibit 78C is an "Employee History report outlining the money paid to Roberts during the year 1996, at a time when she was clearly gainfully employed with Moorman's Inc.  As noted in paragraph 47 of the Revised Presentence Investigation Report, a Victim Impact Statement submitted by the U.S. West successor, Qwest Business Resources, Inc. suggested that it had suffered additional losses due to the defendant's actions, and its efforts in investigating the matter and cooperating with authorities.

3.   **Roberts concealed the U.S. West behavior from Moorman's and charged Moorman's for Some of the Expenses associated with her Continued Relationship with U.S. West.**

Roberts falsified expense reports and calendars submitted to or otherwise in the possession of Moorman's to conceal her other employment and to induce Moorman's to pay for expenses related to her other employment. Specifically, Roberts carefully concealed from Moorman's her behavior as it related to U.S. West.  She reported to Moorman's that she was on business trips in Denver when U.S. West required her attendance there.  She also altered her calendar maintained at Moorman's to make the trips appear legitimate.

In June 1996, Roberts misrepresented the purpose of her April 11, 1996 trip to meet with the disability experts hired by U.S. West in an expense report she submitted to Moorman's. Indeed, in the expense report Roberts submitted to Moorman's, she made it appear that the trip to Denver was exclusively a trip for Moorman's benefit and included expenses for a car rental and an airline ticket that was purchased, but never used.

The records also indicate that Roberts charged Moorman's for expenses relating to her trip to collect her buyout package from U.S. West.  Although Roberts took vacation time from Moorman's for August 14, 15, and 16, 1996, Roberts sought and received reimbursement for expenses relating to the trip.  Roberts requested and received reimbursement from Moorman's for $464 for the round trip ticket to Denver, $131.00 car rental, a $38.00 taxi fare, and $61.00 in meals.  As she did for her April trip, Roberts made the trip appear to be solely on behalf of Moorman's.  Because of the vague nature of the expense reports, however, it is impossible to accurately determine the amount of money Roberts collected from Moorman's due to her duplicity.

As can be seen, however, the two schemes intertwined at various stages and intersected at the Post Office in Keokuk, Iowa.

### III.     Obstruction of Justice

Generally, at the time Moorman's hired Roberts, her main function was to oversee the modernization of the Moorman's computer system.  In performing this function, Roberts hired a company called Irving Burton and Associates, also known as "IBA" to be the "project manager." IBA, with the approval of Roberts, then subcontracted the vast majority of the work to the Oracle Corporation branch located in Denver, Colorado.

On or about December 30, 1997, ADM purchased Moorman's, which then became one of its subsidiaries.  In early 1998, ADM received an anonymous letter informing it that Roberts was serving on the board of directors for IBA at the same time IBA was the "project manager" for the systems upgrade.   ADM internal security investigators started an investigation in early May, 1998.  ADM suspended Roberts on May 18, 1998.  Shortly thereafter, during the course of the investigation into Roberts' actions with Moorman's, ADM investigators uncovered evidence it believed implicated Roberts in the scam involving Morgan and Associates.

From then on the evidence indicates that Roberts, Morgan, Rainey, and possibly others, engaged in a concerted effort to alter records (including calendars, notes and other documents), create documents, and provide false information, both directly and through agents, intermediaries and attorneys, to conceal their fraudulent actions and make it appear that Morgan and Associates provided legitimate, valuable services to Moorman's.  As noted, for example, Morgan produced documents, many of which were on Moorman's stationary or contained Moorman's logo, that suggested that the relationship between Moorman's and Morgan began in April, 1996. *(See*, for

example, G. Ex. 17D-1) These documents could not have been manufactured by Morgan alone, as Roberts' signature and handwriting appears on many of them.  Roberts, Morgan and Rainey also submitted calendars with entries relating to Moorman's, provided a document apparently altered to make it appear to be a contemporaneous faxed note or letter between Roberts and Morgan, altered work product from other companies to make it appear to be related to Morgan, and provided numerous articles claiming that they represented Morgan's "work product," despite that at least four of those articles were written and published after ADM terminated Roberts. Many of the false documents produced by Morgan contained (often times exclusively) Roberts' handwriting.  Morgan also encouraged Virginia Rainey to provide false statements and testimony, which she did.

       Finally, and most notably, Roberts produced a notebook to the United States in August, 2000, that included a photocopy of a note from Roberts' supervisor.  (G. Ex. 129B).  Three years later, that note appeared at trial on a separate memo allegedly drafted by Roberts in 1998, which was a focal point of her defense. (G. Ex. 129A) This "memo" was shown to be a fake, as each of the individuals whose names appeared on the memo (John Jones and Dennis Sollberger) denied knowing of its existence prior to 2003, when they were made aware of it in preparation for the trial.  Moreover, both of the individuals testified that they had never heard the allegations contained in the memo and that action would have been taken if the memo were actually created and distributed as Roberts claimed at trial.  In fact, Sollberger testified that the "post-it" note attached to Defendant's Exhibit 39 (the memo) was from a proposal submitted to their human resources department regarding building up the I.S. department – a completely different document than that presented by the defendant.

**IV.     Acceptance of Responsibility**

Based on the "Defendant's Version of the Offense" submitted on or about July 12, 2004, it is clear that the defendant continues to dispute the vast majority of the evidence as outlined herein, and as presented during the course of her trial.  Despite the defendant's entry of a plea of guilty, it is clear that she has not "clearly demonstrated a recognition or affirmative acceptance of personal responsibility for her criminal conduct."  While it is not too late for her to do so, the government continues its objection to the reduction in offense level under Guideline Section 3E1.1 until the Court is satisfied that the defendant has truly accepted responsibility.

Respectfully Submitted,

JAN PAUL MILLER
UNITED STATES ATTORNEY

By:     s/Patrick D. Hansen_____
        Patrick D. Hansen
        Assistant U.S. Attorney
        Illinois Bar No. 6187536
        318 South 6th Street
        Springfield, IL 62701
        Tele: 217/492-4450
        Fax: 217/492-4512
        E-mail: patrick.hansen@usdoj.gov

23

<u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on April 2, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Patrick Tuite
Attorney for Christine Roberts

                      s/Patrick D. Hansen
                      Patrick D. Hansen
                      Assistant United States Attorney
                      318 South Sixth Street
                      Springfield, IL 62701
                      (217) 492-4450
                      Fax: (217) 492-4512
                      patrick.hansen@usdoj.gov